[Cite as *State v. Bluhm*, 2016-Ohio-7126.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

    Plaintiff-Appellee,                         :

                                                   No. 15AP-938

v.                                                     :       (C.P.C. No. 14CR-2530)

Jacob F. Bluhm,                                        :       (REGULAR CALENDAR)

    Defendant-Appellant.                        :

---

D E C I S I O N

Rendered on September 30, 3016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Samuel H. Shamansky Co., L.P.A., Samuel H. Shamansky, Donald L. Regensburger*, and *Colin E. Peters*, for appellant. **Argued:** *Colin E. Peters.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Jacob F. Bluhm, appeals from the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to a jury verdict finding him guilty of two counts of aggravated vehicular homicide, six counts of aggravated vehicular assault, and two counts of operating a motor vehicle while under the influence of alcohol or a drug of abuse ("OVI"). After merger of various counts, the trial court sentenced appellant to one count of aggravated vehicular homicide, in violation of R.C. 2903.06, a felony of the second degree, three counts of aggravated vehicular assault, in violation of R.C. 2903.08, each felonies of the third degree, and one count of OVI, in violation of R.C. 4511.19, a first-degree misdemeanor. The trial court

imposed prison terms of seven years, three years, three years, one year, and six months respectively, running each term consecutively except for the OVI sentence, which would be served concurrently. The court also imposed a lifetime license suspension with no possibility of limited driving privileges.

## I. Assignments of Error

{¶ 2} Appellant appeals and assigns the following four assignments of error for our review:

> [I.] Appellant's convictions for Aggravated Vehicular Homicide, Aggravated Vehicular Assault, and OVI were against the manifest weight of the evidence, in violation of his right to due process as guaranteed by the Ohio Constitution.
>
> [II.] Trial Counsel's failure to object to the admissibility of the State's evidence and preserve the issue for appeal constitutes ineffective assistance of counsel and was in violation of Appellant's rights as guaranteed by the United States and Ohio Constitutions.
>
> [III.] The trial court abused its discretion by communicating with the foreperson of the jury, outside the presence of the other jurors, after deliberations had commenced.
>
> [IV.] The trial court committed plain error by imposing sentence without considering mandatory factors and ordering that the terms be served consecutively without making required findings.

## II. Trial Testimony

{¶ 3} All charges against appellant arise out of a drunk driving incident culminating in a one-vehicle accident in which appellant's pickup truck left the road at high speed and rolled into a farm field. The accident ejected all five occupants, injuring four and killing one.

{¶ 4} The testimony generally established that on the night of November 27th and early morning hours of the 28th, 2013, appellant and a group of friends, most of them in their early twenties, gathered at a sports bar in Madison County to drink and socialize. At approximately 12:30 a.m. on November 28th, some of the group left in appellant's 2006 Chevrolet truck. In the truck were appellant, brothers David and Rick Thompson, Daniel

Toops, and Tiffany Eye.  At approximately 12:40 a.m., the state highway patrol received a call of a one-vehicle accident on State Route 161 in Franklin County.  Emergency services found Toops dead at the scene, Rick pinned under the truck with very severe leg injuries, and all other occupants ejected and injured to some degree.

{¶ 5}   David testified that on the night in question he left work around 10:00 p.m. and went directly to Lee's Sports 'n' Spirits Bar ("Lee's Bar") in Plain City to meet a group of friends, including his brother, appellant, Toops, and Eye, as well as others not involved in the accident.  They stayed at the Lee's Bar approximately one and one-half to two hours, during which time David consumed approximately five beers and one shot of alcohol.  All the others were drinking as well, although in David's estimation Toops, who was slightly older than the others, probably consumed the least.  The group decided to leave Plain City and go to a bar in downtown Columbus before closing time, a transition they had undertaken several times in previous months.  David, Rick, Eye, Toops, and appellant got into appellant's truck in the parking lot.  Their companion Josh Mink decided to follow in his own vehicle with two passengers.  Toops initially considered driving his own vehicle separately as well, but was persuaded to ride in appellant's truck with the others.

{¶ 6}   David had known appellant for some time, and could not recall appellant letting anyone else drive his truck during that period.  Appellant sat in the driver's seat, Toops sat in the front passenger seat, David sat in the left rear passenger seat, Eye in the center, and Rick in the right rear passenger seat.  Appellant at first drove conservatively as they departed Plain City, but as they followed State Route 161 toward Dublin and Columbus, he became "[r]eckless[,] * * * put it to the floor, never let off of it."  (Tr. Vol. II at 64.)   Rick suggested, to no avail, that appellant slow down.  David then tapped appellant on the shoulder and asked him to "[s]low down" as well, and appellant replied "[s]hut up, pussy."  (Tr. Vol. II at 64.)  Immediately thereafter, appellant lost control of the truck going over a railroad crossing.  David could tell that a wreck was inevitable from the speed and sideways attitude of the truck.  He saw a ditch approaching straight ahead, felt "a big boom and then it was lights out."  (Tr. Vol. II at 66.)  He came to in a corn field, his shoes missing, and feeling very disoriented.

{¶ 7}   As David regained his bearings, Mink, who had been following in his own vehicle, approached him in the corn field. His initial confusion and impairment, David felt, was primarily due to a concussion, rather than actual intoxication, based on his own experience drinking alcohol.  After Mink helped David back to Mink's truck, he observed Mink running through the corn field looking for the others involved in the accident. Shortly thereafter, paramedics arrived at the scene.  Paramedics treated David at the scene and then transported him to Riverside Methodist Hospital in Columbus.  David described his injuries as seven rib fractures, a fracture of his T-5 vertebra, a concussion, a punctured left lung, and road rash.  He was hospitalized for 2 days and took 12 weeks to further recover at home.  At the hospital, law enforcement officers came to interview him but David was unable to speak with them at length because of his breathing difficulties. Two further police officials spoke with him one day later, at which time he provided some details regarding the accident, particularly who was driving the truck.

{¶ 8}   During his testimony, David was shown a photograph taken in the truck. He stated the picture was taken with a cell phone approximately 10 to 20 seconds before the accident.  It depicts him, his brother, and Eye bunched together in the back seat of the truck.  He also was shown a surveillance video recorded in the parking lot at Lee's Bar.  He confirmed that the video depicted, among other activity, himself and appellant walking to the driver's side of the truck, and Toops, Rick, and Eye walking to the passenger side of the truck.  The video then depicts the truck leaving the parking lot.

{¶ 9}   On cross-examination, David acknowledged that during the time in question he took Adderall under a doctor's prescription. He stated that he was probably legally drunk at the time they left the Lee's Bar.  He acknowledged that he tested positive for marijuana after the accident, but denied smoking any on the day of the accident.  He also acknowledged that at the scene, he may have incorrectly stated to an interviewing police officer or state trooper that there were only two people in the back seat of the truck. He agreed that he may have told the trooper that appellant had only one beer to drink, but interpreted this as his observation that he had only seen appellant drink one beer at Lee's Bar.  He revisited his earlier testimony to state that, as they were leaving Lee's Bar, appellant   initially   drove   conservatively   until   they   reached   the   open   highway,

approximately two miles, at which point appellant "ripped into it and never let up."  (Tr. Vol. II at 108.)

{¶ 10} The next witness for the state was Rick.  His testimony largely corroborated that of his brother on events preceding the accident.  After getting off work on the day in question, Rick and appellant went to Tuttle Mall where they bought clothes and matching hats.  They went to Lee's Bar in Plain City.  His brother, David, arrived approximately one hour after he and appellant were at Lee's Bar.  Through the course of the night, Rick observed David with a beer in his hand continuously.  He also observed appellant on at least one occasion with a beer in his hand.  Rick could not recall accurately how much alcohol he consumed himself.  He saw Toops drinking at some point, but knowing Toops not to be a heavy drinker, estimated that Toops consumed at most one or two light beers.

{¶ 11} When the groups left Lee's Bar to go to downtown Columbus, Rick at first considered getting in Toops's truck.  He was not concerned about Toops's ability to drive at that point.  After discussion, all five in the group got into appellant's truck.  Rick corroborated David's description of the relative seating position of driver and passengers in the truck.  The group was in high spirits, and, during a period in which appellant initially drove conservatively, they laughed and took pictures of each other in the truck.

{¶ 12} Rick's testimony exhibited an exceptionally clear and detailed recollection of the accident itself. Rick heard the truck exhaust noise increase in volume and leaned forward to observe that the speedometer was approaching 100 m.p.h.  Rick was concerned because on the way to Lee's Bar, he had hit black ice and he knew that appellant's tires were bald from doing burnouts.  He also knew of a sharp curve immediately following the railroad tracks they were approaching. He asked appellant to "slow the F down."  (Tr. Vol. II at 139.)  David repeated the request and appellant responded, "Shut the F up you pussies." (Tr. Vol. II at 139.)  Appellant did not slow down. When the truck hit the tracks, it went airborne and came down on an angle toward the driver's side, spun, hit the roadside ditch, and began flipping.  As the truck flipped, Rick saw that some of the other passengers were no longer in the truck.  As the truck flipped multiple times, Rick attempted to restrain himself by gripping the passenger assist handle with both hands, at one point letting go with one hand and reaching out to try and keep

Toops in the truck, which he was unable to do, and he then saw Toops ejected as well. Rick was then ejected himself, and the truck rolled to rest on top of him.

{¶ 13} Rick found that he was trapped in the ditch with the bed of the truck across his pelvis and hips so that he could not see his legs. He began yelling for help, but none of the other passengers responded. Mink soon pulled up to the scene and spoke to him. Mink then proceeded to search back and forth across the area, looking for the others and coming back to check on Rick occasionally. Shortly thereafter, emergency personnel arrived at the scene and lifted the truck off Rick with an inflatable airbag. At that point, Rick lost consciousness and did not come to until several days later in the hospital, where he had been placed into a medically induced coma.

{¶ 14} Rick spent 89 days in the hospital. His primary injuries were a broken tibia in his left leg, a broken femur in his right leg, broken bones in his hand, degloving injuries to his legs and feet, and infections due to the contaminated open wound sites. Reconstructive treatment consisted of rods in each leg, pins in an ankle, and skin grafts. The severe pain caused by these injuries and multiple ensuing surgeries required Rick to receive opiate pain medications for long enough to suffer significant withdrawal symptoms when his doctors tapered off his dosage.

{¶ 15} Rick identified two hats presented as exhibits as those worn by himself and appellant at the time of the accident. They were identical, custom-made hats. Based on this and other items of clothing, he confirmed that the parking lot surveillance video at Lee's Bar showed appellant entering the driver side of the truck.

{¶ 16} On cross-examination, Rick agreed that he had been drinking for approximately five hours on the night in question. He stated that he had not given prior statements to law enforcement in connection with the investigation.

{¶ 17} Mink testified on direct examination that on the night in question he left his job at a bank at approximately 4:00 p.m. He had family in town for the holidays and around 8:00 p.m. took two of the out-of-town relatives to Lee's Bar. He had grown up in the Plain City area and knew Rick, Dave, and appellant from school or social activities.

{¶ 18} Appellant and Rick were already in a group when Mink arrived. They were drinking and doing shots. Mink and his cousins intended to accompany the others to the arena district in downtown Columbus. He observed the five others get into appellant's

truck and followed, with his cousins, in his own truck. Because of the relative placement of the two vehicles in the parking lot, he left Lee's Bar a couple minutes behind appellant. He called Toops and learned the route that appellant would take toward Columbus, using the same route himself.

{¶ 19} Traveling eastbound on State Route 161, Mink approached another vehicle that had come to a complete stop in the road. As he moved to go around it, he saw a wrecked truck in the ditch. The truck was lying on its roof with its front toward the road. Mink immediately pulled over and ran to the accident scene. The driver of the other vehicle obtained a flashlight and together they looked for the occupants of appellant's truck both inside and around the truck.

{¶ 20} They first located appellant in front of his truck lying by the side of the pavement. Appellant was just coming to, unable to stand, but coherent although in shock. Mink kept searching and found Eye in the field next to the ditch. She was confused but responsive. Mink's cousin wrapped her in a coat and stayed with her while Mink returned to the truck. Moving to the field side of the wrecked truck, he found Rick trapped beneath the tailgate. Rick was conscious and repeatedly asked where his brother David was, but Mink did not yet know. Mink soon located David, who was attempting to stand with difficulty. Mink walked David over to his truck and helped him into the passenger seat. Mink then returned to appellant's truck to tell Rick that he had found David alive. At this time, emergency personnel arrived at the scene and directed him to stop looking for Toops and return to his own truck. Mink reluctantly did so.

{¶ 21} Trooper Timothy Ehrenborg, of the Ohio State Highway Patrol, testified regarding his response to the accident scene and subsequent investigation. Trooper Ehrenborg testified that he was tasked with supervising the ongoing investigation of the November 28th accident, compiling information, and cleaning up the accident scene. After the fact, this involved collection of evidence and coordination of the accident reconstruction unit.

{¶ 22} On the night of the accident, Trooper Ehrenborg arrived to find that emergency personnel and some good Samaritan bystanders were already at the scene. He spoke with Mink and medical personnel. Because the accident was located near the Franklin/Madison County line and adjoined several nearby municipalities or townships,

personnel from several jurisdictions were on the scene.  He established that the time of the first call for assistance was at 12:40 a.m. on November 28th and noted that he arrived at the scene at 1:12 a.m.  Rick had already been freed by emergency personnel and either placed in a squad or taken by squad to the hospital.  With the more urgent aspects of the situation under control, Trooper Ehrenborg ran the truck license plate to find that the truck was registered to appellant.  He then located Toops, who had been declared dead by medical personnel and for the time being left where he lay.

{¶ 23}  Trooper Ehrenborg identified several pictures he had taken at the scene and described them.  These included pictures of blood on the ground where Rick was trapped under the truck, and documentation of the bald condition of one of appellant's truck's tires.  He documented the road conditions as cold but with a clean, dry roadway.  On questions addressing the more technical side of the accident reconstruction, Trooper Ehrenborg deferred to the actual accident reconstruction specialist.

{¶ 24} Trooper Ehrenborg testified that later in his investigation, based on information provided to another trooper who interviewed the truck occupants at the hospital, he determined and charted the seating positions of the passengers and driver in the truck, placing appellant behind the wheel.  In doing so, he disregarded conflicting information provided by Eye, who initially indicated that Toops was the driver.  He relied instead on other informants who were clear that appellant was in fact behind the wheel, and Trooper Ehrenborg noted that appellant had himself indicated he was the driver.

{¶ 25}  On cross-examination, Trooper Ehrenborg indicated he did not perform a DNA analysis to determine who was at the wheel, or request a fingerprint analysis.  He did not consider it necessary to order any further measures, such as a foot pedal impression to determine whose foot was last placed on the brake.  He stated that he had no personal indication of the level of blood alcohol for the various parties involved until he began compiling information gathered by other investigators.

{¶ 26}  Eye was called by the state to testify.  On the day in question, Eye left work around 9:00 p.m. and met the others at Lee's Bar.  She was a high school classmate of appellant and Mink, and had met the other members of the group more recently.  She estimated she consumed four beers and one shot of liquor before the group decided to leave around 12:30 a.m.  Eye corroborated the testimony of others that Toops consumed

less alcohol than other members of the group on that evening. Although she had a clear recollection of the arrangement of the passengers in the rear seat of the truck, she was not sure of who was driving and who was in the front passenger seat, although she had the impression that Toops was driving. She had no recollection of the accident proper, and her first memory thereafter was of waking up on the ground in pain. She was transported by emergency personnel to Dublin Methodist Hospital and released after one to two hours. After this, she was taken to Riverside Methodist Hospital where she was kept for three days. She suffered two broken clavicles, two spinal fractures, and a bruised lung.

{¶ 27} When shown the surveillance video of the parking lot at Lee's Bar, Eye testified she could identify the various members of the group as they approached appellant's truck. She was not asked, based on her view of the parking lot video, which position the passengers took in the truck. Eye further testified on cross-examination that Toops, who was in her experience not a heavy drinker, was the least intoxicated of the group and that both appellant and Rick were very intoxicated. She could not confirm the content of any conversation in the truck prior to the accident. Eye stated she was 90 percent sure that Toops was driving, and agreed that this made sense because he was the least intoxicated and she would have considered this before she accepted a place in the truck. She had no recollection of an interview taken by a state trooper on the morning of the accident. She agreed that a blood alcohol test at the hospital showed she had a .156 blood alcohol level. She confirmed she had briefly dated appellant, and maintained a social relationship with him and his family after the accident.

{¶ 28} Trooper W. Scott Davis, of the Ohio State Highway Patrol, testified for the prosecution. After the accident, he was dispatched to Riverside Methodist Hospital to interview the persons involved. He began by locating appellant as the registered owner of the wrecked truck. Friends and family of the injured were already at the hospital, but Trooper Davis had no difficulty locating appellant and interviewing him in his hospital room with appellant's parents present. Due to appellant's injuries, which prevented him from writing, appellant's mother produced a partial written statement dictated by appellant. Trooper Davis then completed the balance of the statement in his own handwriting based on a series of questions and answers, most crucially, appellant's statement that he was driving the truck:

A. I asked him if he had -- if he was driving a car or truck that night.

Q. And what was his response to you.

A. "A truck."

Q. Did you ask him about -- well, I guess, let me ask you, what other things did you ask him about?

A. I asked him whose struck [sic] he was driving; and he stated, Mine.

(Tr. Vol. III at 252.) Appellant seemed coherent and aware of his circumstances throughout the interview, despite his injuries and treatment.

{¶ 29} On cross-examination, Trooper Davis stated that, during the same series of interviews at the hospital, Eye stated she was 90 percent sure that appellant was not the driver of the truck at the time of the accident. Trooper Davis also acknowledged on cross-examination that his written record of the interview reads, more accurately, "Were driving a truck or car," with the reply "A truck." (Tr. Vol. III at 261.) He acknowledged that the omission of the word "you" before "driving" in the question as written makes the answer ambivalent when taken out of context. He nonetheless emphasized that the thrust of his question was unmistakable; he believed that the written notes did not reflect how he asked it and how he believed appellant to have understood the question and answered it. On re-direct examination, he restated that the actual content of his question was as follows: "I verbally stated to Mr. Bluhm, Were you driving a truck or car today?" (Tr. Vol. III at 273-74.)

{¶ 30} Trooper Davis further testified on cross-examination that when he interviewed David, the written statement provided at the hospital by David indicated that he could not accurately recall the passengers in the truck. He acknowledged that in contrast, Eye's statement did accurately list the passengers.

{¶ 31} Trooper Bradley, Long of the Ohio State Highway Patrol, testified as an accident reconstruction specialist. Using an aerial image of the accident site, he pointed out the truck's trajectory as it travelled eastbound on State Route 161 in Madison County, lost control just at the Franklin County line, continued on into Franklin County and rolled through a ditch and into a corn field. Using survey equipment and tire tracks, he was able

to determine the truck's speed and trajectory. Commencing his analysis at the first sign of "yaw" tire marks where the truck went out of control, and continuing through its final resting place and gouge marks in the field, he calculated the truck's speed in a range of 95 to 103 m.p.h. After further analysis of information contained in the truck's airbag control module, which records deceleration and speed based on wheel speed sensors, he determined that this data was consistent with the lower end of his calculated estimate of 95 m.p.h. None of the other forensic evidence obtained at the scene supported any cause for the accident other than excessive speed resulting in a one-vehicle rollover crash.

{¶ 32} On cross-examination, Trooper Long indicated that the investigating officers had not undertaken fingerprint or DNA analysis to attempt to determine where the various occupants were in the truck and who the driver was. He felt that such analysis would have been futile in any case because all the occupants had been tossed around inside the truck during the accident. He stated there was no evidence of application of brakes on the truck before the accident, and that a brake pedal foot impression would not have yielded useful results.

## III. DISCUSSION

{¶ 33} Appellant's first assignment of error asserts that his convictions were against the manifest weight of the evidence. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting Black's Law Dictionary 1594 (6 Ed.1990).

{¶ 34} Our review on appeal must acknowledge the superior position of the finder of fact at trial in resolving evidentiary conflicts and assigning weight to testimony. As the finder of fact, the jury is in the best position to weigh the credibility of testimony by assessing the demeanor of the witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome. The jury can accept all, a part or none of the testimony offered by a witness, whether it is

expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact. *State v. McGowan*, 10th Dist. No. 08AP-55, 2008-Ohio-5894, ¶ 13, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 35} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Thompkins* at 387. An appellate court should reverse a conviction as against the manifest weight of the evidence in only the most "exceptional case in which the evidence weighs heavily against the conviction," instances in which the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 36} Appellant asserts that the weight of the evidence demonstrates that appellant was not the driver of the truck at the time of the accident. This is based on Eye's testimony that she was "90-percent sure" that Toops was driving. (Tr. Vol. III at 233.) Appellant argues that the testimonies of David and Rick to the contrary must be discounted because both admitted to drinking heavily on the night of the accident, and David suffered a concussion that affected his memory and made him incapable of giving an accurate account immediately after the accident.

{¶ 37} The state asserts to the contrary that the weight of the evidence in fact overwhelmingly supports the jury's conclusion that appellant was the driver. Both David and Rick gave detailed accounts on the moments preceding the accident, which Eye was unable to do. Both David and Rick recalled details of the conversation with appellant as appellant continued to drive the truck at excessive speed and refused to slow down for the upcoming curve. Appellant's statement to Trooper Davis at the hospital, although controverted to some extent as described above, constituted an admission, if believed, that appellant was driving the truck. Mink, not personally involved in the accident and with his memory therefore unaffected by physical trauma, testified he personally observed appellant get into the driver's seat of the truck in the parking lot at Lee's Bar. Eye, in contrast, was unable to recall events immediately preceding the accident or the accident itself. While her testimony at trial was consistent with prior statements to law

enforcement, she was herself as intoxicated on the night in question as Rick and David, and admitted some confusion as to whose truck she was supposed to ride in. Mink, who drank little that night, clearly recalled appellant taking the driver's seat in the parking lot and Toops taking the front passenger seat. All witnesses who addressed the issue agreed that appellant rarely, if ever, allowed anyone else to drive his truck.

{¶ 38} Faced with conflicting testimony on this pivotal issue, the jury was free to disregard Eye's testimony and find credible the testimony of multiple other witnesses stating that appellant was indeed the driver of the truck at the time of the accident. Given the evidence presented, there is no indication that the jury lost its way and created a manifest miscarriage of justice. We find that the jury verdict was not against the manifest weight of the evidence and overrule appellant's first assignment of error.

{¶ 39} Appellant's second assignment of error asserts appellant did not receive the constitutionally guaranteed effective assistance of trial counsel because trial counsel failed to object to admissibility of certain evidence, particularly appellant's hospital statement to investigating officers.

{¶ 40} In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The defendant must then establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at paragraph 2(b) of the syllabus.

{¶ 41} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). A verdict

adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel. *State v. Hester*, 45 Ohio St.2d 71, 75 (1976).

{¶ 42} Appellant's trial counsel filed a pretrial motion to suppress evidence collected during the investigation. At a pretrial status conference, defense counsel stated that, while the motion to suppress was not withdrawn, counsel would not press the issue. The trial court never ruled on the motion to suppress and appellant's statements to Trooper Davis during his hospital interview were admitted without objection. On appeal, appellant now argues that this failure to seek suppression of the hospital statement and later failure to object at trial was crucial in light of the fact that counsel's principal defense strategy was to dispute the identity of the driver at the time of the accident.

{¶ 43} Accepting, arguendo, that the failure to prosecute the motion to suppress or object to admission of appellant's statement at trial fell below reasonable professional norms for trial counsel, appellant fails to articulate on appeal a theory under which the pretrial motion was meritorious, and further fails to argue any reasonable probability that the result of the trial would have been different had the motion to suppress been granted. *See generally Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *State v. Santana*, 90 Ohio St.3d 513 (2001).

{¶ 44} With respect to the merits of the motion to suppress, at the pretrial hearing, trial counsel indicated that there was little basis to exclude statements made to Trooper Davis in the hospital. On appeal, appellant asserts only that he was still physically "beat up" as a result of the accident and still had alcohol in his system when he gave the statement. (Tr. Vol. III at 249.) Trooper Davis testified to the contrary that, after being read his *Miranda* rights, appellant answered appropriately and was cognizant of the situation.

{¶ 45} With regard to the probable outcome of the proceedings, appellant's admission that he was driving was, at best, cumulative to the detailed recollections of Rick and David and the eyewitness testimony of Mink as to who took the wheel in the parking lot at Lee's Bar. These were contradicted only by the somewhat less conclusive testimony of Eye. Given the strength of the evidence on this issue, exclusion of the contested statement would not have created a reasonable probability of a different outcome. In

sum, appellant does not meet the standard to demonstrate ineffective assistance of trial counsel, and appellant's second assignment of error is overruled.

{¶ 46} Appellant's third assignment of error asserts the trial court erred when it communicated with the jury foreman during deliberations. During deliberations, the jury sent the following question to the court: "What circumstances would cause a witness statement to be disallowed? Did the court decide witnesses answered with clear understanding?-After Miranda." (Tr. Vol. V at 5.) After conferring, counsel for both sides agreed with the court that the question was not intelligible and that further communication would be appropriate. The court convoked the jury foreperson in the presence of counsel and engaged in a brief colloquy to clarify the meaning of the jury's question. The court then dismissed the foreperson from the discussion and conferred with counsel. All parties agreed on a response that would simply restate the written jury instructions, generally telling the jury that it was the sole judge of credibility for witness testimony.

{¶ 47} Pursuant to *State v. Wade*, 10th Dist. No. 03AP-774, 2004-Ohio-3974, ¶ 25, appellant correctly argues that a deficiency in the procedure used to respond to jury questions, if it influences the jury improperly, may require reversal. Appellant concedes on appeal, however, that the content of the actual discussion with the foreperson, and the written response ultimately sent to the jury, were appropriate. Appellant objects only to the trial court's questioning of the jury foreperson alone. Citing *United States v. United States Gypsum Co.,* 438 U.S. 422, 460-62 (1978), appellant argues that conversation during deliberations with a single member of the jury heightens the risk of injection of the judge's personal views, even unintentionally, which can taint the otherwise objective jury instructions. Appellant cites no other case law for the proposition that *any* in-person communication by the judge with the jury foreperson, in the presence of counsel for both sides, is improperly influential per se.

{¶ 48} We first note that the trial court here was careful to avoid the problems inherent in ex-parte communications between court and jury. *See generally State v. Wilhelm*, 5th Dist. No. 03-CA-25, 2004-Ohio-5522, ¶ 28, citing *Rushen v. Spain*, 464 U.S. 114 (1983), *Remmer v. United States*, 347 U.S. 227 (1954), and *Bostic v. Connor*, 37 Ohio St.3d 144, 149 (1988) ("As a general rule, any communication with the jury outside the

presence of the defendant or parties to a case by either the judge or court personnel is error which may warrant the ordering of a new trial."). The judge made sure that counsel for both sides were present[1] and participated in the process as the foreperson was convoked, the question explained, and the written answer to the jury elaborated.

{¶ 49} In contrast, *U.S. Gypsum* involved an ex-parte communication between judge and foreperson that encouraged the jury to reach a verdict without a written instruction. Counsel for the parties were not consulted or present. The communications occurred in the context of an obviously deadlocked jury that had already received a charge pursuant to *Allen v. United States*, 164 U.S. 492 (1896), encouraging the jurors to reconsider their positions and reach a consensus. The United States Supreme Court in *U.S. Gypsum* duly noted the risks associated with the judge undertaking such a meeting during deliberations: "Any *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise." *U.S. Gypsum* at 460. "First, it is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury -- all the more so when counsel are not present to challenge the statements." *Id.* The objectionable nature of such communication was heightened by "references by the foreman to the jury's deadlock, as well as an exchange suggesting the strong likelihood that the foreman carried away from the meeting the impression that the judge wanted a verdict 'one way or the other.' " *Id.*

{¶ 50} Apart from the judge's care in consulting with counsel during the resolution of the jury issue, the present case is further distinguishable from *U.S. Gypsum* because it involves only the clarification of a question and formulation of an answer to be submitted to the jury after consultation between counsel and court. Our review of the colloquy between the trial court and jury foreperson discloses no indication of any statements that might have influenced the foreperson and affected the outcome. The conversation was a

---

[1] While it is unclear from the record whether defendant was present or his presence was waived by his counsel, we do not address the same as this was not raised as an assigned error.

neutral attempt to establish the meaning of the jury question and determine, in the absence of the foreman and after consultation with counsel, the appropriate answer to be returned to the jury. In the present circumstances, there was no prejudice to appellant from the procedure employed by the trial court to resolve the jury question, and appellant's third assignment of error is overruled.

{¶ 51} Appellant's fourth assignment of error asserts the trial court failed to comply with R.C. 2929.11 and 2929.12 when imposing sentence. Appellant further argues the trial court did not make mandatory findings required by R.C. 2929.14(C)(4) before imposing consecutive prison terms.

{¶ 52} The sentencing entry in the present case contains the following language:

> The Court has considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12. The Court further finds that a prison term **is** mandatory, as to Count One.

(Emphasis sic.) (Oct. 14, 2015 Jgmt. Entry at 1.)

{¶ 53} Where the sentencing entry contains express statement the court has considered the statutory factors addressing the purposes of felony sentencing, it complies with R.C. 2929.11 and 2929.12. *State v. Reeves*, 10th Dist. No. 14AP-856, 2015-Ohio-3251, ¶ 7. The trial court did not err in this respect.

{¶ 54} With respect to application of R.C. 2929.14(C)(4), and the imposition of consecutive prison terms, appellant's argument has merit. Pursuant to R.C. 2929.14(C), terms shall be served concurrently unless the court makes the requisite statutory finding as follows:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16,

2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b)  At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c)  The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 55} The sentencing court is not required to particularize its factual reasons for finding that the conditions of R.C. 2929.14(C) are met, but merely state that it has found so.  *State v. Sullivan*, 10th Dist. No. 11AP-414, 2012-Ohio-2737, ¶ 24.  "The trial court is not * * * required to recite any 'magic' or 'talismanic' words when imposing consecutive sentences."  *State v. Bass*, 10th Dist. No. 12AP-622, 2013-Ohio-4503, ¶ 37, quoting *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 86.  On appeal, we will find that the trial court has properly made the requisite findings when we "can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings."  *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 29.  The court must make its R.C. 2929.14(C)(4) findings at the time of sentencing and incorporate them into the sentencing entry.  *Id.* at ¶ 26, 30; *State v. Dixon*, 10th Dist. No. 15AP-432, 2015-Ohio-5277, ¶ 20-23.

{¶ 56} Under the statute, the trial court must make three conjunctive findings.  The two initial findings are, first, that consecutive sentences are necessary to protect the public from future crime or punish the offender, and, second that consecutive sentences are not disproportionate to seriousness of the offender's conduct. Having so found, the court must then find whether one or more of the additional factors under R.C. 2929.14(C)(4)(a) through (c) apply.  R.C. 2929.14(C)(4)(a) and (c) address, respectively, offenses committed while the offender was awaiting trial or sentencing on other offenses, and defendants who present a criminal history that demonstrates the necessity to protect the public from future crime.  The parties agree that these sections are not applicable here. R.C. 2929.14(C)(4)(b) is the relevant factor in this case: the court must find that multiple

offenses were committed as part of one or more courses of conduct, and that "the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."

{¶ 57} Our review of the sentencing hearing and entry leads us to conclude that the trial court did not make the requisite findings under R.C. 2929.14(C)(4). Even if we do not hold the court to "talismanic words," the court's consideration of some aspects of the crime is not sufficient to support findings required by R.C. 2929.14(C)(4). The court did explicitly consider that "the horror of Mr. Thompson waking up with a car on top of him and the long term physical effects that he will have to suffer as well as the fact that Mr. Toops is dead," does reflect consideration of the harm caused by the offense. (Tr. Vol. V at 36.) The court did not, however, further articulate this harm in relation to the other factors such as protection of the public or the adequacy of concurrent sentences. We find that this is insufficiently precise to comply with R.C. 2929.14(C)(4). Furthermore, the trial court did not incorporate R.C. 2929.14(C)(4) findings into the sentencing entry as required by *Bonnell*.

{¶ 58} The state argues here, as it has in the past, that trial counsel did not object to the trial court's failure to articulate the statutory findings, and that we can only review the alleged error under a plain error standard, that is, appellant is held to demonstrate on appeal that the outcome of the proceeding would have been different and that he would not have received consecutive sentences if the trial court had complied with the statute. This court has consistently held that when the record demonstrates that the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, the sentence is contrary to law and constitutes plain error. *State v. Ayers*, 10th Dist. No. 13AP-371, 2014-Ohio-276, ¶ 15; *State v. Phipps*, 10th Dist. No. 13AP-640, 2014-Ohio-2905, ¶ 57. "Although the state disagrees with the plain-error-as-a-matter-of-law standard employed in [our] case[], we are bound by the doctrine of stare decisis and will follow this court's precedent." *Id.* We accordingly sustain appellant's fourth assignment of error in part and overrule in part.

**IV.  Conclusion**

{¶ 59} In accordance with the foregoing, appellant's first, second, and third assignments of error are overruled.  Appellant's fourth assignment of error is sustained in part and overruled in part, and this matter is remanded to the Franklin County Court of Common Pleas for resentencing in compliance with R.C. 2929.14(C)(4) and to incorporate the same into the sentencing entry.

*Judgment affirmed in part,*
*reversed in part, and cause remanded.*

SADLER and HORTON, JJ., concur.

───────────────